UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| BRYCE PALAR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:11-cv-4039-SLD-JAG |
| ) | |
| BLACKHAWK BANCORPORATION, ) | |
| INC. d/b/a BLACKHAWK BANK & ) | |
| TRUST, ) | |
| ) | |
| Defendant. | |

## ORDER

Plaintiff Bryce Palar is a former employee of Defendant Blackhawk Bancorporation, Inc. Palar was originally offered a job by his mentor and fellow baseball enthusiast, Gerry Huiskamp, who also happens to be the President of Blackhawk. After Palar was fired from his junior loan officer position, he filed a four-count complaint against Blackhawk. Blackhawk now moves for summary judgment on all four counts. The Court held oral argument on the motion on September 5, 2013. For the reasons explained below, Blackhawk's motion for summary judgment, ECF No. 28, is GRANTED in part and DENIED in part. Blackhawk is granted summary judgment on all issues except for Blackhawk's alleged violation of the Illinois Wage Payment and Collection Act, as explained below.

## BACKGROUND

Each party submits close to 100 paragraphs of purportedly relevant facts. Because of the copious mix of facts and evidence, the Court will attempt to achieve some clarity by first summarizing the events and circumstances leading up to Palar's termination. The Court will then delve into the specific facts and evidence necessary to resolve each cause of action separately.

Palar was a freshman in high school playing on the Rock Island American Legion baseball team when he first met Gerry Huiskamp. The two bonded over baseball and remained friends throughout Palar's high school and college baseball seasons. After Palar graduated college, Huiskamp offered him a job at Blackhawk. Palar accepted. He started in 2005 as a management trainee and held the position of junior loan officer when he was fired in 2010.

The bulk of the events leading up to this lawsuit occurred after an internal audit in 2010 showed some suspicious activity on Palar's personal Blackhawk banking accounts. As was standard practice, Blackhawk employee Brad Ford ordered a credit report on Palar in light of the suspicious activity. Blackhawk employees, including Huiskamp, reviewed the credit report and interviewed Palar about the suspicious activity. Blackhawk also monitored Palar's computer usage for a period of time. The suspicious activity on Palar's account was determined not to be a cause for concern, as everything Palar told Blackhawk checked out.

On October 18, 2010, shortly after the investigation of Palar ended, Huiskamp informed Blackhawk's board of directors that the suspicious activity on Palar's account was no problem but nonetheless recommended that Palar be terminated. Blackhawk employees had been complaining about Palar's job performance since 2008. Huiskamp testified in his deposition that he had essentially been vouching for Palar for some time, hoping that Palar would mature into a quality employee. When the complaints continued, including in the months before the board meeting, Huiskamp ultimately concluded that despite clearing Palar from any wrongdoing based on the suspicious activity on his account, it was time to let Palar go. Huiskamp claims that his decision to recommend termination was based solely on Palar's poor performance and had nothing to do with the recent investigation into Palar's finances. The board of directors voted to terminate Palar's employment that day, but Palar was not immediately told about this decision.

On October 19, 2010, the very next day, Palar delivered a letter to Blackhawk that made a claim for approximately $19,000 of unpaid overtime wages under the FLSA. Palar argued that Blackhawk misclassified him as an exempt employee and that since he was actually non-exempt, he was eligible for overtime pay. Palar argued that Blackhawk should have paid him overtime for the time he spent coaching the Orion High School baseball team because he was essentially forced to coach as a condition of employment. When Palar delivered his FLSA complaint on the 19th, Palar did not know that Blackhawk had already voted for his termination, though some evidence suggests he knew that the issue was going to be discussed at the board of directors meeting the day before.

After delivering the FLSA complaint on the 19th, Palar left the premises. He was not scheduled to work on October 20th. On October 21, 2010, Huiskamp and another Blackhawk employee, T.J. Hoffman, informed Palar that he was fired. They offered him a severance package in exchange for a release of claims. Palar counteroffered for increased severance pay, citing the FLSA complaint as leverage. Blackhawk refused and terminated him without any severance pay.

Palar later sued Blackhawk on a variety of grounds. Blackhawk now moves for summary judgment on each count Palar brings against it:

(1) Violation of the Fair Labors Standards Act, 29 U.S.C. §§ 201, et seq.,

(2) Violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115/5,

(3) Violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, et seq., and

(4) Violation of the Illinois Personnel Record Review Act, 820 ILCS 40/1, et seq.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). On a motion for summary judgment, the Court will construe all facts and draw all reasonable inferences in favor of the nonmoving party. *See Srail v. Vill.of Lisle, Ill.*, 588 F.3d 940, 948 (7th Cir. 2009). When analyzing a motion for summary judgment, the Court does not scour the record in search of evidence to defeat the motion; rather, "the nonmoving party must identify with reasonable particularity the evidence upon which the party relies." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 744 (7th Cir. 2007). To defeat summary judgment, the nonmoving party must present "definite, competent evidence in rebuttal" such that a reasonable jury could find in his favor. *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012).

### I. Fair Labor Standards Act

Palar raises two issues under the Fair Labor Standards Act ("FLSA"): (A) Blackhawk owes him overtime pay because it misclassified him as an exempt employee and (B) Blackhawk fired him in retaliation for filing a complaint for unpaid wages.

#### A. Palar's Claim for Overtime

Palar's claim for unpaid overtime is dependent on two findings: (1) that he was a non-exempt employee and (2) that Blackhawk should have paid him for the time he spent coaching baseball. The Court declines to analyze whether Palar was a non-exempt employee because Blackhawk had no obligation to pay Palar for the time he spent coaching, as will be explained below. While Palar's counsel suggested at oral argument that Palar's claim for overtime pay under the FLSA could survive even without the coaching hours, Palar has offered no evidence that shows he worked any non-coaching overtime, nor could counsel identify any such evidence at oral argument or even confirm that any such evidence exists. *See Winters*, 498 F.3d at 744 (explaining it is the nonmoving party's burden to identify the evidence upon which he relies). Summary judgment is the "put up or shut up" moment in a lawsuit. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Blackhawk is entitled to summary judgment

4

because, without counting coaching hours, no evidence suggests that Palar worked any overtime—an essential element of his FLSA claim for overtime pay. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (explaining that courts should enter summary judgment against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Without any evidence that Palar worked overtime for which he was not properly compensated, no evidence suggests that Blackhawk violated 29 U.S.C. § 207. Accordingly, Palar cannot argue to a jury that Blackhawk violated § 207. Blackhawk is therefore entitled to summary judgment as a matter of law. *See Harris NA v. Hershey*, 711 F. 3d 794, 798 (7th Cir. 2013) ("A mere scintilla of evidence in support of the nonmoving party's position is not sufficient; there must be evidence on which the jury could reasonably find for the non-moving party.").

Turning to Palar's argument that Blackhawk should have paid him overtime for the time he spent coaching baseball, Palar seeks to cast Blackhawk's encouraging and accommodating volunteerism in the local community as forced volunteerism.[1] Blackhawk effectively subsidizes local volunteerism. Blackhawk employees who are interested in volunteering are permitted to leave the bank early without penalty. For example, in Palar's case, if his baseball team had a game or practice during the week, Palar was permitted to leave the bank before bank hours were over so that he could coach the event. Opp. to Mot. for Summ. J., Ex. 21 at 119-25, ECF No. 32. But even though Palar left before his shift was up, he was never docked any pay or charged any

---

[1] Actually, Palar made no argument in his opposition brief about why he should be paid overtime under the FLSA for the time he spent coaching. Palar's discussion of payment for his coaching activities was limited to a single paragraph arguing that because Huiskamp asked Palar to forfeit any profits he made from coaching, Blackhawk violated the Illinois Wage Payment Collection Act. The Court finds that Palar has thus admitted that summary judgment is warranted on the FLSA overtime issue pursuant to Local Rule 7.1(D)(2), but will nonetheless address Palar's argument, as can be gleaned from his complaint and oral argument.

vacation time. Blackhawk always permitted Palar to leave the bank early to go coach. *Id.*, Ex. 21 at 122.

From what the Court can tell, Palar presents a novel argument. Instead of arguing that he is an employee of Orion High School because he coaches their baseball team, Palar instead argues that he is an employee of Blackhawk because he coaches the Orion baseball team. If Palar was not otherwise employed by Blackhawk as a loan officer, his claim would of course be ridiculous. But since Palar is employed by Blackhawk, he argues that Blackhawk was able to exert sufficient influence over him to force him to coach high school baseball. He further argues that Blackhawk reaps the incidental reward of enhanced reputation in the community as a result of having one of its employees coach baseball. Palar now wants additional payment for all of the time he spent coaching—including time-and-a-half for any time over 40 hours in a week (when combining his time spent coaching and at the bank). While the Court acknowledges that it is theoretically possible for an employer to create an abusive "community involvement" volunteerism policy that would violate the FLSA, this is far from that case.[2] *See* 29 C.F.R. § 553.101(b) ("Congress … expressed its wish to prevent any … abuse of … overtime requirements through coercion or undue pressure upon individuals to 'volunteer' their services."). This is a case where an employee approached an employer about coaching high school baseball and the employer not only encouraged—without requiring—the employee's involvement in the local community, but also accommodated the employee's volunteerism schedule.

---

[2] I use the phrase "community involvement" volunteerism to distinguish cases where employers accept "volunteers" that work for them (e.g., a police department that classifies full-time officers as "volunteers" in order to avoid paying them a salary, see generally *Rodriguez v. Township of Holiday Lakes, et al.*, 866 F. Supp. 1012 (S.D. Tex. 1994)). By "community involvement" volunteerism, I refer to situations where a private company encourages its employees to volunteer in the community (e.g., at a soup kitchen).

6

Palar's ties to baseball are apparent. He played for his high school's baseball team. While in high school, Palar also played for the Rock Island American Legion baseball team. *See* Mot. for Summ. J., Ex. A at 14, ECF No. 28. In fact, Palar first met Huiskamp while playing for the American Legion team. *Id.*, Ex. A at 15-16. Palar continued playing baseball in college and then also started to coach. *Id.*, Ex. A at 21. He was a student coach for Bradley University for a year and the head coach for the Rock Island High School summer team. *Id.*, Ex. A at 21, 41.

Knowing about Palar's ties to baseball, Huiskamp asked about Palar's general interest in coaching baseball when he first approached Palar about working at Blackhawk. *Id.*, Ex. A at 70-74. Palar said that he was interested, though during his deposition, Palar explained that he did not seek a job at Blackhawk with the intention of coaching baseball—he only expressed his interest once asked. *Id.* Regardless of whether he brought it up or Huiskamp brought it up, Palar had previous coaching experience and told Huiskamp that he was interested in continuing to coach baseball.

An opportunity soon presented itself. Importantly, Palar learned of the coaching position at Orion high school not through anyone at Blackhawk, but through an Orion school board member. *Id.*, Ex. A at 107. It was Palar who brought the knowledge of the coaching position to Huiskamp, not the other way around. *Id.*, Ex. A at 108. Palar's testimony is telling:

> Q. And when you talked to [Huiskamp], what did you tell [him]?
> A. I told him the position [of Orion baseball coach] had been made aware to me.
> …
> Q. … Did you tell [Huiskamp] that you were interested in applying for that position?
> A. That is not the first thing I said, no.
> Q. Okay. So why don't we talk about what you first said to [Huiskamp]?
> A. I informed him of the position, and he said that that would be a great way to be involved in the community, and he gave me his blessing to do that, and then I did tell him at that point that it would be something that I would be interested in doing if he gave me his blessing.
> Q. So he encouraged you to take the position or apply for the position?
> A. Yes.

7

> Q. Did he require you to apply for the position?
> A. At that time, no.

*Id.*, Ex. A at 108-09. Even setting aside that one has to wonder why Palar would tell Huiskamp about the Orion baseball coach position if Palar was not implicitly asking to apply for the position, these are not facts that show the type of abusive volunteerism policy that Congress wanted to prevent. *See* 29 C.F.R. § 553.101(b).

Congress did not want to discourage volunteerism by passing the FLSA provisions at issue here. *See id*. Congress simply recognized that it needed to prevent manipulation or abuse of the "volunteerism" exception by employers. *See id.* Thus, in deciding whether a plaintiff is an employee or a volunteer, courts should take a common sense approach and consider the totality of the circumstances. *See Purdham v. Fairfax County School Board*, 637 F.3d 421, 428 (4th Cir. 2011). In this case, the evidence overwhelmingly shows that Palar was not required to coach baseball, he just volunteered.

For one, no evidence suggests that Palar or Huiskamp reasonably expected that Blackhawk would be picking up the tab for every minute that Palar spent coaching. *See* 29 C.F.R. § 553.101(a) (expectation of compensation a factor in determining whether an individual is a volunteer). Numerous bank employees volunteer coached and none received overtime payment from Blackhawk, although all got time off of work to volunteer. *See* Opp. to Mot. for Summ. J., Ex. 22 at 60, 62. Nothing in the record suggests that Palar should have reasonably expected his arrangement to be any different. Further, no reasonable jury could transform Blackhawk's willingness to accommodate Palar's coaching schedule into an expectation that Palar would be paid overtime for his after-work coaching activities. The fact that Palar had no reasonable expectation of accruing overtime suggests that he was not working for Blackhawk when he coached baseball beyond his scheduled shift at the bank.

Another factor that can be relevant in distinguishing between employees and volunteers is "whether the service rendered is an integral part of the alleged employer's business." *Todaro v. Township of Union*, 27 F. Supp. 2d 517, 536 (D.N.J. 1998); *see also Krause v. Cherry Hill Fire Dist.*, 969 F. Supp. 270, 275 (D.N.J. 1997). If the service rendered is critical to the underlying business, then the plaintiff is more likely to be an employee because employees are typically more indispensable to an employer than volunteers. Conversely, volunteers tend to work in supplementary roles. Of course, this is not a bright-line rule, just a potentially relevant factor. In this case, the Court finds it relevant that Palar's coaching activities were not integral to Blackhawk's business, which is banking. That Palar's coaching has nothing to do with banking—other than the incidental reputational boost—suggests that Palar was not an employee of Blackhawk while he was coaching.

The Court further finds the implications of allowing Palar's claim troubling. Calling into question employer policies that accommodate interested employees' volunteerism would be a big step in the wrong direction. Blackhawk allowed Palar to leave early—without losing any pay or vacation time—to volunteer for a local high school. Blackhawk was not abusing or taking advantage of Palar. Huiskamp simply thought Palar was a good coach and encouraged him to share his skills and knowledge of the game with community youth. *See* Mot. for Summ. J., Ex. C at 58-59. Anytime a Blackhawk employee does something positive in the community, Blackhawk, by association, receives a tangential reputational benefit. But just because Blackhawk benefits from hiring and employing community role-models does not mean that Blackhawk should be required to pay each employee for their off-the-clock good deeds, even if Blackhawk acknowledges or encourages said good deeds. Palar's theory, which suggests the

9

opposite, would dissuade employers from encouraging and accommodating employees' volunteerism.

Considering the totality of the circumstances and viewing Palar's coaching activities from a common sense perspective, but drawing all reasonable inferences in his favor, the Court finds that, as a matter of law, Blackhawk was not obligated to pay Palar overtime for the time he spent coaching. Because his coaching activities were the only evidence Palar presented to demonstrate that he worked overtime, Blackhawk is therefore entitled to summary judgment on this issue.

### B.      Palar's Retaliation Claim

From Palar's perspective, he was fired two days after making a claim under the FLSA for unpaid overtime, which understandably made him suspicious that Blackhawk retaliated against him. As such, Palar alleged that Blackhawk violated the FLSA, which makes it unlawful for an employer to discharge an employee for filing an FLSA complaint. 29 U.S.C. § 215(a)(3). Palar argues that he has sufficient evidence to establish a prima facie case: (1) he engaged in a protected expression by filing a claim for overtime pay, (2) he suffered an adverse employment action when he was fired, and (3) a causal link exists between his discharge and his filing a complaint for overtime pay. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012). The only issue here is the causal link.

While at first glance the timing of Palar's discharge was suspicious, it was also explained through the course of discovery. Palar admits that he did not communicate any complaint about unpaid overtime to Blackhawk until October 19, 2010. Mot. for Summ. J., Ex. A at 142. Blackhawk has shown that the decision to terminate Palar was made on October 18, 2010, making it impossible for Blackhawk to have retaliated against Palar for something he had not done yet. The board of directors meeting minutes from October 18 state: "Upon motion by Mr.

Shurr, seconded by Mr. Scott, the Board authorized management to release Mr. Palar effective immediately." *Id.*, Ex. K. Further, Huiskamp swears under oath that he did not have knowledge of Palar's claim for unpaid overtime when he recommended Palar's discharge to the board of directors on October 18. *Id.*, Ex. J. Finally, T.J. Hoffman, a vice president of Blackhawk, testified that on October 19, Palar asked him whether he knew what happened at the October 18th board meeting. Because Hoffman did not, he called Jim Huiskamp ("Jim") and learned from Jim that the board decided to discharge Palar the day before. *Id.*, Ex. R at 12.

In response, Palar relies most heavily on the suspicious timing—he was informed that he was fired only two days after filing the FLSA complaint. While suspicious timing is an "important evidentiary ally" for Palar, suspicious timing alone will "rarely be sufficient … to create a triable issue." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (quoting *Lalvani v. Cook County, Ill.*, 269 F.3d 785, 790 (7th Cir. 2001) and *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)); *see also Sauzek v. Exxon Coal USA*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation based on suspicious timing alone, however, does not support a reasonable inference of retaliation; instead, plaintiffs must produce facts which somehow tie the adverse decision to the plaintiffs' protected actions."). This case presents an especially weak case of suspicious timing because, unlike other cases on this issue where an employee is fired shortly after a decision-maker learns of the protected activity, Palar offers no evidence that any decision maker at Blackhawk was aware of his FLSA complaint before Blackhawk decided to discharge him. Instead, Palar urges the Court to deny summary judgment because a jury could reasonably conclude that Blackhawk fabricated its decision to fire Palar on October 18 as part of a cover-up. As confirmed during oral argument, however, the only evidence in support of his theory is a conversation Palar had with Hoffman on October 19. Palar

11

argues that Hoffman lied to Palar by telling him that no decision about his termination was made on October 18. But that is not what the evidence shows. Both Palar and Hoffman testified that what Hoffman actually communicated to Palar on October 19 was that Hoffman did not know whether a decision had been made. *See* Mot. for Summ. J., Ex. R at 12; Opp. to Mot. for Summ. J., Ex. 21 at 193. The difference between "no decision has been made" and "I don't know if a decision has been made" matters here; in light of Hoffman's actual statement, no evidence shows that anybody at Blackhawk ever said or thought that the decision to fire Palar occurred after October 18. What is more, Hoffman gave a very reasonable explanation for why he would not have told Palar he was fired anyway—"I didn't think it was my authorization to tell somebody that they were released when it came from the board. It should come from one of the board of directors at that time." Mot. for Summ. J., Ex. R at 13. Accordingly, no evidence supports Palar's theory that Blackhawk waited until after October 18 to fire him. On this record, Blackhawk is granted summary judgment on Palar's FLSA retaliation claim.

## II. Illinois Wage Payment and Collection Act

Palar argues that Blackhawk violated the Illinois Wage Payment and Collection Act ("IWPCA") in three different ways. Each argument will be addressed separately.

### A. Interest and Attorney's Fees

Under the IWPCA, an employee not timely paid his final compensation is entitled to statutory damages, costs and attorney's fees:

> Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees.

820 ILCS 115/14. Palar was told that he was fired on October 21, 2010. On December 15, 2010, Palar demanded final compensation under the IWPCA. Opp. to Mot. for Summ. J., Ex. 31. Blackhawk admits that it did not cut Palar his final compensation check until around July 2011. Mot. for Summ. J. at 35. Such final compensation does not appear timely paid. *See* 820 ILCS 115/5 ("Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee."). Accordingly, Blackhawk is not entitled to summary judgment on this issue.

### B.  Palar's Coaching Activities

Huiskamp testified that Palar was not allowed to keep the money he made coaching:

> Q. So what was the bank's requirement then, with respect to pay?
> A. …. In Bryce's case I told him that from the amount that he received, that he could hold out enough pay whatever the tax was, so that he wouldn't be penalized, and that the balance of that he could use to buy equipment or he could pay his assistants.
> Q. In other words, he couldn't keep the money for himself?
> A. He couldn't keep the money for himself.

Opp. to Mot. For Summ. J., Ex. 22. Palar argues that Blackhawk therefore violated the IWPCA. Upon further clarification during oral argument (and based on letters filed with chambers after the hearing), Palar's theory is that Blackhawk essentially deducted Palar's wages in violation of Section 9, which states in relevant part:

> deductions by employers from wages or final compensation are prohibited unless such deductions are (1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; (4) made with the express written consent of the employee, given freely at the time the deduction is made….

820 ILCS 115/9.

Palar cannot show that Blackhawk actually violated Section 9 because even if Huiskamp asked Palar to return the money he made coaching, that coaching money was not a "wage" from Blackhawk under the statute. The IWPCA defines "wage" as follows: "any compensation owed

13

an employee by an employer pursuant to an employment contract or agreement between the 2 parties...." 820 ILCS 115/2. Thus, for Palar to have earned a wage for his coaching activity, he must prove that he is owed money pursuant to an employment contract or agreement between him and Blackhawk. No such agreement exists.[3]

Not only was the coaching money not a "wage" from Blackhawk, but Blackhawk never deducted (or withheld) it from a payment it made to Palar. All Palar has shown is that Huiskamp asked him to return the money he received from Orion high school. Thus, Blackhawk did not violate Section 9 because it never deducted any money from a wage it owed Palar. Blackhawk is therefore entitled to summary judgment on this issue.

### C. Pay for Personal Days and Final Day

Palar claims he is owed wages for two unused personal days. The only evidence Palar offers is his own affidavit that simply says he was entitled to three personal days in 2010 and he used only one. But more importantly, Palar offers no statutory or case-law support suggesting that Blackhawk was required to pay him for unused personal days. *Cf.* 820 ILCS 115/2 (defining "final compensation" to include "the monetary equivalent of earned vacation and earned holidays" but remaining silent on personal days). With almost no evidentiary support and absolutely no legal support, Palar cannot defeat summary judgment. Blackhawk is therefore granted summary judgment on this issue of two personal days.

Finally, Palar wants payment for October 22, 2010, asserting that he was still an employee that day, contrary to Blackhawk's position that he was informed of his termination the day prior. His only evidence supporting this claim is his own affidavit that says Blackhawk emailed him around 4:45 pm on October 22, terminating his employment at that time. Even

---

[3] To the extent Palar argues that Blackhawk owed him salary for the time he spent coaching, the Court has already addressed and rejected that argument above.

14

setting aside his own complaint, which alleges Blackhawk told him he was fired on October 21 (Compl. at ¶ 26, ECF No. 1), a mound of evidence refutes Palar's assertion that he was terminated on October 22, including the actual email that he received on October 22 that states he was told that he was fired the day before (Opp. to Mot. for Summ. J., Ex. 26). Blackhawk is granted summary judgment on this issue.

## III.   Fair Credit Reporting Act

Palar raises three arguments for why Blackhawk violated the Fair Credit Reporting Act. First, the parties dispute whether Blackhawk conducted an "investigative consumer report." If Blackhawk did so, different disclosure rules apply, which were not followed here. Next, Palar alleges that Blackhawk took adverse action against him based on the consumer report without furnishing him with a copy of the report and a description of his rights, as required by statute. Finally, Palar asks the Court to find that Blackhawk is a "credit reporting agency" and that as a result, Blackhawk owed him certain due process.[4]

### A.   Investigative Consumer Report

An "investigative consumer report" is defined, in relevant part, as requiring that information be obtained through personal interviews:

> a consumer report or portion thereof in which information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through personal interviews with neighbors, friends, or associates of the consumer reported on or with others with whom he is acquainted or who may have knowledge concerning any such items of information….

15 U.S.C. § 1681a(e). If Blackhawk conducted an investigative consumer report on Palar, then it owed him certain disclosure obligations. Palar makes a single argument to establish that

---

[4] Under the Fair Credit Reporting Act, Blackhawk was entitled to procure a consumer report on Palar for employment purposes if Palar authorized it in writing. Though Palar did not remember doing so, he did in fact sign such an authorization in 2005. *See* Mot. for Summ. J., Ex. F. As such, Blackhawk did not violate the Fair Credit Reporting Act by procuring a consumer report on Palar.

Blackhawk conducted personal interviews with Palar's "neighbors, friends, or associates" or other people with whom he is acquainted: Jim called a community leader to investigate Palar. *See* Opp. to Mot. for Summ. J. at 34-36. But the evidence Palar cites does not suggest that Jim ever contacted a "community leader" to compile an investigative report or investigate Palar. *See id.* (citing Ex. 18, which is an email from Jim to Palar stating in part: "Evan brought this program to my attention and I thought it would be a good fit for you to help you get a lot of exposure to the different groups out there. If you can't commit to this let me know so I can pass it on to someone else…."). At oral argument, Palar's counsel asserted that Jim called a program administrator from a group called Ready2Serve. Although not cited in his brief, Exhibit 4 to Palar's Opposition Brief is an unknown document that references somebody calling a program administrator from Ready2Serve, so the Court will assume *arguendo* that Exhibit 4 is evidence that Jim did in fact call a program administrator from Ready2Serve. *See* Opp. to Mot. for Summ. J., Ex. 4. The purpose of the call, however, appears to have been gathering information about the Ready2Serve program—not obtaining information on Palar's character, general reputation, personal characteristics or mode of living. *See* 15 U.S.C. § 1681a(e). No evidence suggests that somebody at Blackhawk called the program administrator at Ready2Serve in order to get that administrator's opinion of Palar.

Moreover, the timing of this alleged phone call is unclear. Based on its own review of the evidence, however, the Court infers that Jim called the program administrator from Ready2Serve sometime in late 2009 or early 2010. *Compare* Ex. 18 (email from Jim to Palar about Ready2Serve dated December 2009) *with* Ex. 4 (unknown document mentioning that Ready2Serve program starts in January). The timing of this call—as best as can be pieced together—further undercuts Palar's claim because a consumer report was not ordered on Palar

16

until August 2010. *See* Mot. for Summ. J., Ex G at ¶ 19. Accordingly, even assuming Jim's call to the Ready2Serve administrator constitutes a "personal interview" under the Fair Credit Reporting Act, which it does not, it occurred about eight months before Blackhawk ordered the consumer report on Palar. Blackhawk is granted summary judgment on this issue.

### B. Causation

Under the Fair Credit Reporting Act, Blackhawk could not take adverse action against Palar based "in whole or in part" on a consumer report without first providing Palar with a copy of the report and a description of his rights. 15 U.S.C. § 1681b(b)(3)(A). Palar raises two adverse actions: termination and failure to promote. Blackhawk does not dispute that it failed to provide Palar with a copy of the report and a description of his rights. The only issue is whether Blackhawk's decisions to terminate or not promote him were based at least in part on the consumer report.

Palar has no direct evidence that the consumer report played any role in Blackhawk's decisions to not promote him or terminate him. The evidence shows that Palar was fired for performance issues and that "the expanded audit … showed that everything was in order." Mot. for Summ. J., Ex. K; *see also id.*, Ex. D at 9-14, Ex. L at ¶ 30-37, Ex. O at ¶ 4-8, Ex. P at ¶ 4-15, Ex. Q at ¶ 4-8. Just like for his FLSA retaliation claim, Palar argues that a jury could reasonably conclude that Blackhawk's evidence is part of a cover-up. He even points to the same evidence (his conversation with Hoffman) that could supposedly support a jury verdict in his favor. But like his retaliation claim, his conversation with Hoffman on October 19 does not help him. Palar's only relevant evidence is suspicious timing. And again, this is not enough to survive summary judgment. *See Culver*, 416 F.3d at 546.

17

### C. Blackhawk as Credit Reporting Agency

Palar adds three sentences in his brief to argue that the Court should alternatively find that Blackhawk is a credit reporting agency (without citing any legal authority or even defining "credit reporting agency"). Based on Blackhawk's reply, the Court assumes that Palar is arguing that Blackhawk is a credit reporting agency under the Fair Credit Reporting Act, which defines the term as follows:

> any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f). Palar does not explain why Blackhawk meets this definition. And as far as the Court can tell, Palar offers no evidence that Blackhawk regularly furnished consumer reports to third parties. Without any evidence, argument, or legal support, Palar's argument fails. Blackhawk is entitled to summary judgment on this issue.

### IV. Illinois Personnel Record Review Act

The Illinois Personnel Record Review Act provides employees a private right of action if they are denied access to personnel records. 820 ILCS 40/1 *et seq*. Blackhawk argues that Palar's claim under the Illinois Personnel Record Review Act should be dismissed for failure to exhaust administrative remedies and/or because it fully complied with the Act.

Palar argues that Blackhawk waived any argument that he failed to exhaust administrative remedies because Blackhawk neglected to plead the affirmative defense in its answer. It is true that failure to exhaust is, in this context, an affirmative defense. *See Musso v. Excellence in Motivation, Inc.*, No. 10-cv-3236, 2010 WL 3385452 (N.D. Ill. Aug. 24, 2010). But the Seventh Circuit will only find waiver for failing to plead an affirmative defense if the plaintiff can show prejudice. *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005) (finding no

abuse of discretion in allowing defendant to raise failure to exhaust at summary judgment without pleading the defense because plaintiff was not prejudiced); *Neuma, Inc. v. Wells Fargo & Co.*, 515 F. Supp. 2d 825, 849-50 (N.D. Ill. 2006). In this case, Palar has not shown any prejudice as a result of Blackhawk's failure to plead this affirmative defense. *See Neuma*, 515 F. Supp. 2d at 849-50 (explaining that a plaintiff "cannot establish prejudice merely by showing that the case has progressed significantly since the defendants answered his complaint." (citing *Williams v. Lampe*, 399 F.3d 867, 871 (7th Cir. 2005) (per curiam)).

Palar does not argue that he exhausted his administrative remedies. As a result, Blackhawk is entitled to summary judgment on this issue. *See Tank v. Deutsche Telekom, AG*, 2013 U.S. Dist. LEXIS 56096, at *27 (N.D. Ill. 2013); *Banks v. Chi. Bd. of Educ.*, 2013 U.S. Dist. LEXIS 33611, at *35 (N.D. Ill. 2013); *Wiess v. Vill. of Brooklyn*, 2008 U.S. Dist. LEXIS 85270, at *16 (S.D. Ill. 2008); *Anderson v. Bd. of Educ. of Chi.*, 169 F. Supp. 2d 864, 870 (N.D. Ill. 2001). The Court declines to address Blackhawk's alternative argument that it fully complied with the statute.

## CONCLUSION

Blackhawk's motion for summary judgment, ECF No. 28, is GRANTED in part and DENIED in part. Blackhawk is granted summary judgment on all issues except for Blackhawk's alleged violation of the Illinois Wage Payment and Collection Act, as explained in this opinion.

Entered this 25th day of September, 2013.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE
